IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10–cv–00334–PAB–KMT

JEFFREY ALLEN PHILLIPS,

      Plaintiff,

v.

SUSAN TIONA, Doctor, Kit Carson Correctional Center,
HOYT BRILL, Warden, Kit Carson Correctional Center,
JODI GRAY, Health Administrator, Kit Carson Correctional Center, and
CORRECTIONS CORPORATION OF AMERICA, owner of private prison KCCC,

      Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

_____

**Magistrate Judge Kathleen M. Tafoya**

      This matter is before the court on Defendants' "Motion for Summary Judgment" (Doc. No. 255, filed June 30, 2011 [Mot. Summ. J.]) and Plaintiff's "Motion to Strike Defendants [sic] Exhibit A" (Doc. No. 290, filed Aug. 16, 2011 [Mot. to Strike].)  For the following reasons, the court recommends that Plaintiff's Motion to Strike be denied, and that Defendants' Motion for Summary Judgment be granted.

**STATEMENT OF THE CASE**

      The following statement of undisputed facts is derived from Plaintiff's "Second and Final Amended Complaint" (Doc. No. 41, filed Aug. 18, 2010 [Am. Compl.]) and the parties' submissions with respect to this recommendation.  Plaintiff is currently incarcerated at Sterling

Correction Facility of the Colorado Department of Correction (CDOC). (Am. Compl. at 4.)[1] From October 2009 to December 2009, however, Plaintiff was incarcerated at the Kit Carson Correctional Center ("KCCC"). (*Id.* at 15.) KCCC is a private for-profit corporation run by Defendant Corrections Corporation of America ("CCA"). (Am. Compl. at 3.)

On August 25, 2009, while Plaintiff was in community corrections, Plaintiff severely broke his right ankle. (*Id.* at 4.) The next day, August 26, 2009, Dr. David Matthews, an orthopedic specialist, perform

ed an Open-Reduction Internal Fixation ("ORIF") on Plaintiff's ankle, which required the insertion of seven screws and two plates. (*Id.*) One of those screws was a 4.5 mm cortical syndesmotic screw. (*See id.* 4–5)

### A. *Plaintiff's Prescription Medications*

On September 11, 2009, in a follow-up visit, Dr. Matthews prescribed Tylenol for Plaintiff's post-operation pain. (Mot. Summ. J., Ex. B.) Dr. Matthews also asked the officers accompanying Plaintiff to bring Plaintiff back in about a month for an X-Ray of his right ankle and to make plans to remove the syndesmotic screw that was inserted into Plaintiff's ankle. (*Id.*)

Upon his release from the hospital, Plaintiff was taken into custody by the Colorado Springs Police Department and was transferred to the El Paso County Jail.[2] (Am Compl. at 4, 7.)

---

[1] For sake of clarity, the court refers to the page numbers of the document scanned by the Clerk of Court.

[2] It is not entirely clear why Plaintiff was taken into formal custody and out of community corrections. The court assumes, without deciding, that Plaintiff may have committed another crime.

Plaintiff received medical care while at El Paso County Jail from Dr. Ron Johnson.  (*Id.* at 5.)
On October 1, 2009, Dr. Johnson prescribed Plaintiff Neurontin for his pain because Plaintiff's
prescription for Ultram from Dr. Matthews was denied as non-formulary.  (Mot. Summ. J., Ex.
A, Deposition of Jeffrey Allen Phillips [Phillips Dep.], 54:20-56:5; Ex C.)

Plaintiff was eventually transferred to KCCC on October 8, 2009.  (Am. Compl. at 5.)
Sometime after his arrival, Defendants Tiona and Gray denied Plaintiff his "prescribed
medication"—presumably the Tylenol and Neurontin previously prescribed by Drs. Matthews
and Johnson, respectively.  (Am. Compl. at 5.)  Neurontin is prescribed very cautiously in the
correctional environment due to its significant potential for abuse, as well as its black market
value.  (Mot. Summ. J., Ex. D, Affidavit of Dr. Tiona [Tiona Aff.], ¶ 13.)  Thus, in CDOC
correctional facilities, Neurontin is only prescribed for chronic management of neuropathic pain
unrelieved by other medications. (*Id.* ¶ 14.)  Plaintiff's medical needs did not meet this threshold
under the CDOC guidelines and Neutrontin was discontinued.  (*Id.*; Mot. Summ. J., Ex. E.)
Instead, Defendant Tiona prescribed Plaintiff Ibuprofen.  (Am. Compl. at 5.)

Plaintiff maintains that prescribing Ibuprofen was contrary to Dr. Matthew's treatment
plan, caused his ankle to heal unnaturally, and damaged his liver due to his Hepatitis C.  (*Id.*)
On October 13, 2009—five days after Plaintiff's arrival at KCCC—Defendant Tiona prescribed
Plaintiff Tylenol.  (*See* Mot. Summ. J., Ex. H–I.)  Although, apparently, Plaintiff now disagrees
with that decision as well (Phillips Dep. 41:20-42:14), Plaintiff thanked Defendant Tiona for
putting him on back on Tylenol on October 18, 2009 (*Id.* Ex. H).

3

**B.**     *Plaintiff's Cell and Shower Facilities*

Upon arrival at KCCC, Plaintiff was initially placed in a non-handicapped accessible cell and was denied a wheelchair.  (*Id.* 5–6.)  Because he was on crutches, Plaintiff maintains that when he received his food tray into his cell through the "bean slot,"[3] he was forced to slide the food tray across the "dirty, urine stained concrete floor."  (Am. Compl. at 6.)

On November 4, 2009, Plaintiff was moved to a handicapped cell.  This cell had a desk to eat on, "but as normal for any A.D.A. cell, no seat or chair to sit on and write or eat on."  (Am. Compl at 23.)  Plaintiff maintains that Defendants Tiona and Gray again denied him a wheelchair.  (*Id.*)  Thus, Plaintiff claims he was still forced "to accept his food trays thru the trapdoor (bean slot) placing them again on the dirty, urine stained concrete floor and shoving or sliding his food to his bed in order to eat on his bed."  (*Id.*)  Defendant Gray responded to Plaintiff's grievance regarding this issue by informing Plaintiff that he had been previously instructed on how he could avoid sliding his food across the floor and that, consequently, he should not slide his food across the floor.  (Mot. Summ. J., Ex. T.)

Plaintiff also maintains that he was denied a working handicap-accessible shower.  (*Id.* at 6.)  Although he was initially "placed into shower #1, the only handicapped shower in the segregation unit, [] no water came out of the shower head."  (*Id.* at 17-18.)  He was subsequently moved to a non-handicapped shower and provided with a plastic patio chair to shower on until, on November 2, 2009, the "plastic chair slipped out from underneath [Plaintiff], pinning his head

---

[3] According to Plaintiff, a bean slot is "a trap door in regular safety door with only a opening of about 8" x 18"."  (Am. Compl. at 14.)

against the metal shower door, and casted right ankle . . . pinned underneath plastic patio chair."

(*Id.* at 18.)  After that incident, he was "forced to shower in a non-handicapped shower, with no

plastic chair or handrails for assistance, and [] by doing so forced this plaintiff to change his

underwear and clothes on a unrinated, spit on, snotted on, with masterbation [sic] excretements

[sic] on the dirty infested floor, which was just previously used, and not cleaned or disinfected

before this plaintiff Phillips got into the same shower, just used by 10-15 inmates before me."

(*Id.* 19-20.)  Plaintiff maintains that "a simple wheelchair would have solved [the food tray]

problem and the shower problem."  (*Id.* at 23.)

Plaintiff's medical records, however, never indicated that Plaintiff should have been

provided with or used a wheelchair.  (Phillips Dep. 18:3-18:6.)  Instead, Dr. Matthews

specifically indicated that Plaintiff should be on crutches.  (*Id.* 17:16–18:6.)

### C.    *Plaintiff's Course of Treatment*

Plaintiff arrived at KCCC in a knee-high cast and was on crutches.  (*Id.* 5-6.)  The day he

arrived, October 8, 2009, Plaintiff underwent an initial health screening, during which Nurse

Anne Coash determined that Plaintiff did not exhibit any visible signs of trauma or illness

requiring immediate emergency or doctor's care.  (Mot. Summ. J., Ex. F; Phillips Dep. 27:2-21.)

On October 13, 2009, five days after Plaintiff's arrival at KCCC, Dr. Tiona signed

Plaintiff's Ambulatory Health Record and indicated a plan to x-ray Plaintiff's right ankle.  (Mot.

Summ. J., Ex. I.)  On October 22, 2009, Defendant Tiona directed the KCCC nursing staff to

"check condition of cast and visible skin." (Mot. Summ. J., Ex. J.)  The nursing staff conducted

this examination of Plaintiff's cast and found it to be "in good repair."  (*Id.*)

On October 28, 2009, per Dr. Tiona's previous order, Plaintiff's right ankle was x-rayed. (Phillips Dep. 64:7-12.)  Plaintiff's x-rays revealed traditional plating and a syndesmotic screw, as well as that his right ankle was stable and the fracture had healed nicely.  (Tiona Aff. ¶ 5.)  After reviewing Plaintiff's post-surgical status, Defendant Tiona consulted with an Orthopedic Physician's Assistant at Denver Health Medical Center.  (*Id.* ¶¶ 6-7; *see also* Mot. Summ. J., Ex. K.)  Defendant Tiona was informed that removal of the syndesmotic screw is elective and that the orthopaedic department at Denver Health Medical Center does not routinely remove the screw.  (Tiona Aff. ¶ 7.)  Defendant Tiona was also informed that if Plaintiff was suffering pain three to six months after the screw had broken—a normal occurrence (*see* Mot. Summ. J., Ex. K)—then the screw may be removed (Tiona Aff. ¶ 7).  Additionally, Defendant Tiona reviewed orthopedic literature about screw removal and weight bearing, which also suggested that it was not medically necessary to remove the sydesmotic screw.  (*Id.* ¶¶ 8-9.)

On November 3, 2009, Plaintiff filed a grievance form complaining that he had been at KCCC "for almost 30 days now and have not been seen by a Dr. or Nurse for my ankle" and seeking to have the screw removed pursuant to Dr. Mathews proposed treatment plan.  (Mot. Summ. J., Ex. S.)  Defendant Gray responded to Plaintiff's grievance on November 5, 2009 by stating that "Dr. Tiona is reviewing your files and will be consulting an orthopedic specialist within the DOC system to determine if the screws need to be removed.  Medical will follow up with you."  (*Id.*)  Defendant Gray did not possess any authority to schedule Plaintiff for surgery with an outside, non-CDOC medical professional. (Gray Aff. ¶ 2.)

6

On November 5, 2009, Plaintiff had an appointment with Defendant Tiona in which she removed Plaintiff's cast to find a well-healed surgical scar.  (Tiona Aff. ¶ 10; Mot. Summ. J., Ex. L.)  Defendant Tiona also gave Plaintiff a walker to use in his cell.  (Mot. Summ. J., Ex. L.)

On November 10, 2009, Defendant Tiona visited Plaintiff's cell and informed Plaintiff that she "communicated with orthopedics at Denver Health and that the syndesmotic screw does not need to be removed."  (*Id* Ex. M.)  Defendant Tiona also reviewed range of motion exercises with Plaintiff and told him to begin to bear weight as tolerated, using a walker for support as needed until the ankle got stronger.  (*Id.*)  Defendant Tiona again saw Plaintiff on December 1, 2009 and worked with Plaintiff on his range of motion exercises.  (*Id.* Ex. N.)  She also demonstrated to Plaintiff "how to use his walker to better support his ankle while still encouraging weight bearing" and range of motion.  (*Id.*)

On July 12, 2010, Plaintiff filed a Negligence and Medical Malpractice Claim against Defendant Tiona with the Department of Regulatory Agencies.  (Phillips Dep. 101:8-23; Mot. Summ. J., Ex. P.)  The Colorado Medical Board of the Department of Regulatory Agencies dismissed Plaintiff's Complaint against Dr. Tiona, stating  that "the Panel found no reasonable cause to warrant further action in this regard."  (Mot. Summ. J., Ex. Q.)

## PROCEDURAL HISTORY

Plaintiff filed his Amended Complaint on August 18, 2010 bringing claims against Defendants Tiona, Brill, Gray, and CCA.  Specifically, Plaintiff asserts claims (1) pursuant to 42 U.S.C. § 1983 alleging that Defendants violated his rights under the Eight Amendment of the United States Constitution, (2) pursuant to Sections II and III of the Americans With Disabilities

7

Act (ADA), (3) pursuant to Section 504 of the Rehabilitation Act, and (4) pursuant to the "Confidentiality Act" and the Fifth Amendment.  (*See* Am. Compl.)

Defendants Tiona and Gray answered on November 3, 2010.  (Doc. No. 68.)  Defendants CCA and Brill filed motions to dismiss on October 14, 2010 and January 4, 2011, respectively.  (Doc. Nos. 61 & 125.)  On February 11, 2011, Plaintiff moved to voluntarily dismiss his fourth claim for relief—that is, his "Confidentiality Act" and Fifth Amendment claim.  (Doc. No. 168.)

On March 11, 2011, this court recommended that Defendants CCA and Brill's Motions to Dismiss be granted to the extent they sought to dismiss Plaintiff's Eighth Amendment claims against them, but denied with respect to Plaintiff's ADA claims.  (Doc. No. 200.)  The court also recommended that Plaintiff's Rehabilitation Act claim be dismissed in it entirety against all four defendants.  (*Id.*)  Finally, the court recommended that Plaintiff's fourth claim for relief be dismissed.  (*Id.*)

District Judge Brimmer adopted this court's recommendation on June 7, 2011 and dismissed Plaintiff's Eight Amendment claims against Defendants CCA and Brill; Plaintiff's Rehabilitation Act claim against Defendants CCA, Brill, Tiona, and Gray; and Plaintiff's fourth claim for relief.  (Doc No. 248.)  Therefore, while Plaintiff's ADA claims remain pending as to all defendants, Plaintiff's Eighth Amendment claims remains pending only as to Defendants Tiona and Gray.

Defendants filed their Motion for Summary Judgment on June 30, 2011.  Plaintiff responded on August 16, 2011 (Doc. No. 291 [Resp.]) and Defendants filed their reply on August 26, 2011 (Doc. No 295).  The same day that Plaintiff filed his Response, August 16,

2011, Plaintiff also filed his Motion to Strike.  Defendants responded to the Motion to Strike on

August 31, 2011 (Doc. No. 297 [Resp. Mtn. Strike]) and Plaintiff filed his reply on September 9,

2011 (Doc. NO. 299 [Reply Mtn. Strike]).  Accordingly, these matters are now ripe for the

court's review.

### LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The moving party bears the initial burden of showing an absence of evidence to support

the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the

moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a

genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City & County of Denver*,

36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party

may not rest solely on the allegations in the pleadings, but must instead designate "specific facts

showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P.

56(c).  A disputed fact is "material" if "under the substantive law it is essential to the proper

disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the

evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.

*Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*,

477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence.  *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Concrete Works*, 36 F.3d at 1517.  Moreover, because Plaintiff is proceeding *pro se*, the court, "review[s] [her] pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys."  *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers").  At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record.  *Thomson v. Salt Lake Cnty*, 584 F.3d 1304, 1312 (10th Cir. 2009).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS

### I.    *MOTION TO STRIKE*

The court first considers Plaintiff's Motion to Strike.  Plaintiff maintains that the court should strike Exhibit A to Defendants' Motion for Summary Judgment, which consists of excerpts from Plaintiff's deposition transcript, because Defendants' Motion for Summary Judgment, including Exhibit A, was submitted without Plaintiff's changes to the transcript of his deposition.

Federal Rule of Civil Procedure 30(e) allows a deposition witness to request to review the deposition transcript within 30 days after being notified that the transcript is available, and, "if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." Defendants concede that the Exhibit A to their Motion for Summary Judgment was submitted without Plaintiff's changes. (*See* Resp. Mtn. Strike at 9.) However, Plaintiff has not cited, nor can the court otherwise locate, any case or other authority suggesting that the court may not consider *any* portion of a deposition transcript submitted as an exhibit to a summary judgment motion simply because it was filed without the deposition witness's proposed changes thereto.

Otherwise, having reviewed Plaintiff's proposed changes to his deposition testimony, the court finds that Plaintiff will not be prejudiced if Exhibit A to Defendants' Motion for Summary Judgment, or any portion thereof, is considered by the court. First, the court finds that a significant number of the pages and lines of the deposition transcript that Plaintiff sought to change were not even included as part of Exhibit A. (*Compare* Resp. Mtn. Strike Ex. E *with* Mot. Summ J. Ex. A, Phillips Dep.) Second, to the extent that Plaintiff did propose changes to excerpts that were included in Exhibit A, the court finds that Plaintiff's corrections are mostly superficial and, in any event, would not modify the undisputed facts underlying the court's resolution of Defendant's Motion for Summary Judgment. *Cf. Steffens v. Helems,* 57 F. App'x 853, 856 n.2 (10th Cir. 2003) (declining to resolve the question of whether the trial court erred in suppressing the plaintiff's deposition corrections where the corrected deposition testimony would not alter the court's conclusion that summary judgment was appropriate). Accordingly,

11

because no prejudice will result if the court considers Exhibit A to Defendants' Motion for
Summary Judgment, the court finds that Plaintiff's Motion to Strike is properly denied.

## II.      MOTION FOR SUMMARY JUDGMENT

Having disposed of Plaintiff's Motion to Strike, the court turns to Defendants' Motion for
Summary Judgment.  In their Motion, Defendants argue that they are entitled to summary
judgment on Plaintiff's remaining claims for relief under Section II of the ADA, Section III of
the ADA, and the Eighth Amendment.  The court addresses these arguments in turn below.

### A.      Title III of The ADA

Defendants maintain that Plaintiff's claims pursuant to Title III of the ADA must be
dismissed because the sole remedy under Title III is injunctive relief and Plaintiff only alleges
past exposure to ADA violations.  The court agrees.

The existence of a live case or controversy is a constitutional predicate to federal court
jurisdiction, and must exist at all stages of the litigation.  *McClendon v. City of Albuquerque,* 100
F.3d 863, 867 (10th Cir. 1996).  While Title III prohibits discrimination against persons with
disabilities in places of public accommodation, 42 U.S.C. § 12182(a), a Title III plaintiff's sole
remedy is injunctive relief, *Chambers v. Melmed,* 141 F. App'x 718, 720 (10th Cir 2005) (citing
42 U.S.C. § 12188(a).[4]  *See also Lewis v. Burger King,* 361 F. App'x 937 n.1 (10th Cir. 2010)
(citing *Powell v. Nat'l Bd. of Med Exam'rs,* 364 F.3d 79, 86 (2d Cir. 2004)).  "When a party

---

[4] Thus, while Plaintiff may maintain that he seeks only punitive and compensatory
damages, rather than equitable relief in his second claim alleging violations of Title II and III of
the ADA, Title III is not a proper means to obtain such relief.

seeks only equitable relief, as here, past exposure to alleged illegal conduct does not establish a present live controversy if unaccompanied by any continuing present effects." *McClendon*, 100 F.3d at 867 (10th Cir. 1996) (citing *Beattie v. United States,* 949 F.2d 1092, 1094 (10th Cir. 1991)).

Here Plaintiff is no longer housed at KCCC; he was transferred to Sterling Correctional Facility on December 11, 2009. (Am. Compl at 2, 15.) Consequently, Plaintiff does not maintain that Defendants continued to violate his rights under Title III of the ADA after that date. Instead, Plaintiff admits that, upon being moved to Sterling Correctional Facility, he was "prescribed post operational treatment plans [that] were imediately [sic] implemented." (*Id.* at 15.) Thus, Plaintiff's transfer from KCCC to Sterling Correctional Facility renders his Title III claims moot.[5] *Green v. Branson,* 108 F.3d 1296, 1300 (10th Cir. 1997) (prisoner's transfer mooted his claim for declaratory and injunctive relief as a judgment in the prisoner's favor "would amount to nothing more than a declaration that he was wronged, and would have no effect on the defendants' behavior towards him"). Accordingly, the court finds that Plaintiff's claims under Title III of the ADA are properly dismissed for lack of jurisdiction.

---

[5] Plaintiff attempts to controvert Defendants' position that his Title III claims are moot by distinguishing the facts presented in *McClendon* and *Beattie* from those presented here. (Resp. 9-18.) However, he fails to establish that the *legal principle* those cases stand for is inapplicable to this case.

13

**B.** *Title II of the ADA*

Defendants argue that Plaintiff's claims pursuant to Title II of the ADA should be dismissed because Title II does not contemplate liability for individuals or nonpublic entities, and because Plaintiff fails to state a claim for relief under Title II.

The court agrees with Defendants that Title II of the ADA, 42 U.S.C. § 12132, does not contemplate liability against individuals.  *Montez v. Romer,* 32 F. Supp. 2d 1235, 1240-41 (D. Colo. 1999).  Accordingly, the court finds that Defendants Brill, Tiona, and Gray are not subject to liability under Title II of the ADA.

The more novel question, at least in this circuit, is whether Title II contemplates liability against private entities like CCA.  Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The ADA defines "public entity" as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority . . . ."  42 U.S.C. § 12131(1).

Title II clearly applies to state prisons and prison services.  *Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206 (1998).  However, it does not appear that either the Supreme Court, the Tenth Circuit, or the District of Colorado have previously decided whether a private corporation that manages correctional facilities for a state government, like CCA, is considered a public entity for purposes of Title II.

14

In support of their position that Title II does not apply to private entities contracting with the government, Defendants point to a number of cases—the foremost being *Green v. City of New York,* 465 F.3d 65 (2d Cir. 2006). In *Green,* the Second Circuit was faced with the question of whether a private hospital was a public entity because it "carried out a public function pursuant to a contract with the City [of New York], in accord with City rules, and under the direction of City employees." *Id.* at 78. The court found that the plaintiff's theory that the hospital was a public entity failed "to grapple with the actual words of the statute." *Id.*

More specifically, because none of the alternative definitions of a public entity were applicable to the hospital, the court was left to determine whether a private hospital that contracts with a municipality to provide services is an "instrumentality" of a state or local government. *Id.* (quoting § 12131(1)(B)). After concluding that "instrumentality" was susceptible to multiple meanings,[6] and therefore could not be reduced to its plain meaning, the court turned to the canons of statutory construction. *Id.* at 78-79.

In particular, the court considered the canon *noscitur a sociis,* "a word is known by the company it keeps." *Id.* at 79 (citing *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307 (1961)) (although *noscitur a sociis* is not an inescapable rule, it "is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.") The court first noted that, in the statutory definition of public entity,

---

[6] Namely, relying on Webster's Third New International Dictionary, the court founds that "instrumentality" could mean "something by which an end is achieved" or, alternatively, "a part, organ, or subsidiary branch, esp. of a governing body." *Id.*

15

"instrumentality" is one of a string of words, such as "department," "agency," and "special purpose district." *Id.* The court further noted that each of these words, including instrumentality, is qualified by "of a State or States or local government." *Id.* Consequently, the court concluded that, as with the words preceding it, "instrumentality" is best read "as referring to a creature of a state or municipality." *Id.*

The court then found that "[a] private hospital performing services pursuant to a contract with a municipality even if it does so according to the municipality's rules and under its direction, is not a creature of any government entity." *Id.* Consequently, the Second Circuit held that the hospital was a private, not a public, entity, and therefore was not subject to liability under Title II. *Id.*

It appears that nearly every court that has addressed this issue has come to the same conclusion—that the ADA's use of "instrumentalities" refers to "governmental units or units created by them." *Edison v. Douberly,* 604 F.3d 1307, 1310 (11th Cir. 2010) (collecting cases).[7] In fact, in *Edison,* the Eleventh Circuit addressed nearly the exact same question presented here and held that a private prison management corporation that operated a Florida state prison was not a public entity for purposes of the ADA. *Id.* The *Edison* court relied heavily on the Second Circuit's reasoning in *Green*—particularly its resort to the canons of statutory construction—to

---

[7] The court also notes that, since *Edison* was decided, a number of other courts have expressed their agreement with *Green* and *Edison* on this point. *Medina v. Valdez,* No. 08-CV-00456–BLW, 2011 WL 887553, at *1-5 (D. Idaho Mar. 10, 2011); *Maxwell v. S. Bend Work Release Ctr.,* 787 F. Supp. 2d 819, 821-22 (N.D. Ind. 2011); *Castle v. Eurofresh, Inc.,* 734 F. Supp. 2d 938 (D. Ariz. 2010).

interpret the ADA's use of "instrumentality" in a manner consistent with its "plain meaning and context." *Id.* at 1310. Additionally, the court reinforced its holding by recognizing *Green's* nearly unanimous following. *Id.* According, the Eleventh Circuit concluded that the private prison management corporation before it was not a public entity for purposes of Title II of the ADA. *Id.*[8] *See also Medina,* 2011 WL 887553, at *1–5 (relying on *Green* and *Edison* to conclude that the Corrections Corporation of America, the defendant in this case as well, was not a proper defendant to the plaintiff's Title II claim).

The court agrees with the reasoning of *Green, Edison,* and the other courts that have concluded that "instrumentality," as employed in § 12131(1)(B), refers to governmental units or units created by them. Specifically, because the words preceding "instrumentality"—namely, "department," "agency," and "special purpose district"—all refer to traditional government units or entities created by government units, it is clear that Congress' use of "or other instrumentalities" was also intended to refer to a *governmental* unit. 42 U.S.C. § 12131; *Edison,*

---

[8] In her dissent, Judge Barkett maintained that the *Edison* majority "conflate[d] government *contracting* with government *function.*" *Edison,* 604 F.3d at 1311 (Barkett, J., dissenting) (emphasis in original). While she agreed with the *Edison* majority that mere contracting with the government does not make a private company subject to Title II of the ADA, she distinguished the scenario before the Eleventh Circuit, in which a private company "*takes the place of the state* in performing a function within the exclusive province of the state." *Id.* at 1311–12 (emphasis in original). Under those circumstances, Judge Barkett concluded that the "company cannot be permitted to avoid the requirements of the law governing that state function." *Id.* at 13-12. Thus, she distinguished *Green,* as well as other factually similar cases, where the private entity only contracted to provide services that it was otherwise lawfully able to provide, from the facts before the court in *Edison,* where state involvement was essential to perform the function at issue—i.e. operating a prison. *Id.* at 1311.

604 F.3d at 1309.  Because CCA is a private corporation, the court finds that CCA is not subject to liability under Title II of the ADA.

It is worth noting, however, that if the ADA's language were otherwise, the court might well be persuaded by Judge Barkett's dissent in *Edison,* discussed *supra.* at note 8.  Indeed, as Judge Barkett noted in *Edison*, this case is arguably distinguishable from *Green* because CCA is performing an *exclusive* state function.  More specifically, while the private hospital at issue in *Green* was performing a public function that it could lawfully perform without state involvement, here CCA cannot lawfully imprison individuals without the involvement of the State of Colorado.  For all practical purposes, CCA is acting as the state, in a way that it otherwise could not, and thus, arguably functions as a "public entity."  Additionally, Judge Barkett's broader, more functional approach might reconcile better with the "national mandate for the elimination of discrimination against individuals with disabilities." *Edison,* 604 F.3d at 1311 n.2 (quoting *Kornblau v. Dade Cnty.,* 86 F.3d 193, 194 (11th Cir. 1996) (Barkett, J., dissenting)..

Nevertheless, as noted by the *Medina* court, Judge Barkett's approach simply does not comport with the strict language of the statute. *Medina,* 2011 WL 887553, at *3 n.1, *4.  The ADA's definition of "public entity" as "any department, agency, special purpose district, or other instrumentality of a State" simply does not include *any* private entity—no matter what state function it might perform—within its ambit.  42 U.S.C. § 12131(1)(B).  Congress may, at some future juncture, take up Judge Barkett's functional concerns by amending the ADA. *Medina,*

18

2011 WL 887553, at *4.  In the meantime, as noted, the *Edison* dissent has failed to garner any real support from courts nationwide.

Altogether, the court finds that the individual defendants—Defendants Brill, Tiona, and Gray—and CCA are not proper defendants to Plaintiff's Title II claim.[9]  Therefore, the court finds that summary judgment is properly granted as to all defendants on Plaintiff's claims pursuant to Title II of the ADA.

### C.    *Eighth Amendment Claims Pursuant to 42 U.S.C. § 1983*

Defendants argue that they are entitled to summary judgment on Plaintiff's Section 1983 claims, which allege that Defendants Tiona and Gray violated his Eighth Amendment rights against cruel and unusual punishment.  Specifically, Defendants argue that Plaintiff cannot establish that either Defendant Tiona or Gray acted with deliberate indifference to Plaintiff's medical needs, or that Defendants Tiona or Gray's actions caused Plaintiff any actual, quantifiable injury.  (Mot. Summ. J. at 15–25.)  The court is persuaded by Defendants' former argument and, therefore, does not address the latter.

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including reasonable safety from serious bodily harm.  *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008) (citing *Farmer v. Brennan,* 511 U.S. 825, 832 (1994)).  It is well established that prison officials violate

---

[9] Because the court finds that CCA is not subject to liability under Title II of the ADA, the court does not address Defendants' alternative argument that, even assuming CCA were subject to Title II liability, Plaintiff's Title II claim fails on the merits.

the Eighth Amendment if their "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (internal quotation marks omitted).  To demonstrate an Eighth Amendment claim for deliberate indifference, an inmate must satisfy both an objective and a subjective component.  To satisfy the objective prong, a prisoner must demonstrate that his medical need is "objectively, sufficiently serious." *Farmer* v. Brennan, 511 U.S. 825, 834 (1994) (citation and quotation marks omitted).  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999) (citation omitted).  To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a "sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834.  The officials must "know[] of and disregard[] an excessive risk to inmate health and safety." *Id.* at 837.  That is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

For purposes of this Motion, Defendants assume that Plaintiff can establish that Plaintiff's right ankle condition constitutes a serious medical need sufficient to meet the objective prong of the Eight Amendment inquiry.  (Mot. Summ. J. at 18.)  Thus the court addresses Defendants' more particular arguments that Plaintiff cannot establish that Defendants Tiona and Gray, respectively, possessed the requisite state of mind for an Eighth Amendment claim.

### 1.    *Defendant Tiona*

Defendants maintain that they are entitled to summary judgment with respect to Plaintiff's Eighth Amendment claim against Defendant Tiona because Plaintiff's claim merely amounts to Plaintiff's disagreement with Defendant Tiona's (1) decision not to schedule Plaintiff for surgery, (2) failure to provide Plaintiff with a wheelchair, and (3) decision to prescribe Plaintiff Ibuprofen.  The court agrees.

"It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."  *Whitley v. Albers,* 475 U.S. 312, 319 (1986).  Thus, "a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment."  *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).  A prisoner does not have a valid claim of deliberate indifference simply because he was denied "a particular course of treatment" that he desired.  *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006).  In fact, "[a] negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation."  *Perkins v. Kan. Dep't of Corr.,* 165 F.3d 803, 811 (10th Cir. 1999); *see also Estelle,* 429 U.S. at 103 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner").

Here, nothing in the record supports an inference of that Defendant Tiona possessed the culpable mental state required to establish an Eighth Amendment violation.  Instead, the court agrees that the undisputed facts underlying Plaintiff's Eighth Amendment claim merely establish

a difference of opinion between either Plaintiff and Defendant Tiona, or, at very best, an arguable difference of opinion between Dr. Matthews and Defendant Tiona.

First, in support of his position that Defendant Tiona was deliberately indifferent by failing to schedule a surgery to remove the syndesmotic screw, Plaintiff relies primarily on Dr. Matthews post-operation follow-up with Plaintiff, where Dr. Matthews indicated a plan to remove the syndesmotic screw in the future (Mot. Summ. J. Ex. B; *see also id.* Ex. X), as well as an internet printout from the American Orthopedic Surgeons Foundation.[10]   (Phillips Dep. 91:5-92:25, 94:3-10.)   However, the record clearly establishes that Defendant Tiona considered Plaintiff's request to have the screw removed, consulted with the orthopedics department at Denver Health Medical Center and conducted her own independent research, and determined that the syndesmotic screw did not need to be removed.   (Tiona Aff. ¶¶6-7; Mot. Summ. J., Ex. K.)   Defendant Tiona also determined that she might still schedule Plaintiff to have the screw removed if Plaintiff experienced pain three to six months after the screw broke.   (Tiona Aff. ¶ 10.)   The fact that Defendant Tiona reached a different medical conclusion than Dr. Matthews does not establish a constitutional violation.   *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (a difference of medical opinion as to treatment of a prisoner did not establish constitutional violation); *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977) (same).

---

[10] Defendants properly object to this internet printout as inadmissible hearsay.   (Reply at 3.)   However, even if this document were admissible, it would not change the court's conclusion that Defendant Tiona was not deliberately indifferent to Plaintiff's medical needs.

Similarly, Defendant Tiona's decision to initially to prescribe Plaintiff Ibuprofen, despite the fact that Dr. Matthews and Dr. Johnson previously prescribed Tylenol and Neurontin, respectively, does not establish that Defendant Tiona acted with deliberate indifference. Although Plaintiff maintains that Dr. Matthews prescribed Tylenol because Ibuprofen might slow or thwart the healing process and might damage Plaintiff's liver, there is nothing in the record to support this allegation, or that Defendant knew of this concern.  (*Cf.* Tiona Aff. ¶ 16.) Additionally, Defendant Tiona denied Plaintiff a Neurontin prescription because CDOC regulations prohibited prescribing Neurontin to inmates other than in limited circumstances inapplicable to Plaintiff.  (*Id*. ¶ 13; Mot. Summ. J., Ex. E.)  Plaintiff simply cannot establish that, by prescribing Plaintiff Ibuprofen for a few days, Defendant knew of and disregard an excessive risk to Plaintiff's health and safety.  *Farmer,* 511 U.S. at 837.

Finally, there is nothing in the record indicating that Plaintiff's injury required him to be in a wheelchair.  Indeed, Dr. Matthews specifically indicated that Plaintiff should be on crutches. (Mot. Summ. J., Ex. G; Phillips Dep. 17:16–18:1.)  Plaintiff's personal disagreement with Defendant Tiona's supposed decision to deny Plaintiff the use of a wheelchair does not establish an Eighth Amendment violation.  *Ramos*, 639 F.2d at 575.  Moreover, even if the denial of a wheelchair could otherwise support an Eighth Amendment claim, Defendants have set forth undisputed evidence that Defendant Tiona did not have any control over Plaintiff's receipt of a wheelchair.  Administrative regulations establish that a wheelchair, as an ADA accommodation, can only be received from the prison ADA inmate coordinator.  (Mot. Summ. J., Ex. Y.)

Thus, altogether, the undisputed facts make clear that Plaintiff cannot establish an Eighth Amendment deliberate indifference claim against Defendant Tiona.  Accordingly, the court finds that summary judgment is properly entered in favor of Defendant Tiona as to Plaintiff's Eighth Amendment claim against her.

### 2.    *Defendant Gray*

Similar to his allegations with respect to Defendant Tiona, Plaintiff maintains that Defendant Gray violated his Eighth Amendment rights by denying Plaintiff his "prescribed medication" (Am. Compl. at 5), denying Plaintiff the use of a wheelchair (*id.* at 22-23), and failing to schedule Plaintiff for surgery to remove the syndesmotic screw (*see id.* at 16). Defendants argue that they are entitled to summary judgment with respect to Plaintiff's Eighth Amendment claim against Defendant Gray because Defendant Gray's receipt of, and response to, Plaintiff's complaints about his medical treatment alone is insufficient to violate the Eighth Amendment.  (Mot. Summ. J. at 21-24.)

Plaintiff concedes that Defendant Gray operated as a gatekeeper for medical requests. (Phillips Dep 98:3–99:18; *see also* Gray Aff. ¶ 2.)  A prison medical official who "knows that [her] role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if that person delays or refuses to fulfill that gatekeeper role.  *Searlock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).  More generally, however, "[e]xcept in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals." *Bond*

*v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002); *see also Weatherford ex rel. Thompson v. Taylor*, 347 F. App'x 400, 401-03 (10th Cir. 2009) (citing cases); *Hayes v. Snyder*, 546 F.3d 516, 526-27 (7th Cir. 2008).

The court finds that Defendant Gray fulfilled her duty as gatekeeper by responding to several of Plaintiff's medical requests with information on Plaintiff's treatment plans. (*See* Phillips Dep. 98:2–104:14; Gray Aff. ¶ 3–4; Mot. Summ. J., Ex. S–T.) Specifically, on November 5, 2009, in response to Plaintiff's grievance lodged only the day prior, Defendant Gray informed Plaintiff that "Dr. Tiona is reviewing your files and will be consulting an orthopedic specialist within the DOC system to determine if the screws need to be removed. Medical will follow up with you." (Mot. Summ. J., Ex. S.) Contrary to Plaintiff's suggestions that Defendant Gray delayed treatment (Phillips Dep 98:3–99:14), Defendant Tiona saw Plaintiff that very same day, November 5, 2011. (Tiona Aff. ¶ 10; Mot. Summ. J., Ex. L.) Defendant Gray also responded to Plaintiff's grievance about receiving food into his cell by informing Plaintiff that he had previously been advised not to slide his food across the floor because he had been instructed on how to receive his food without the need to slide it across the floor. (Gray Aff. ¶ 4; Mot. Summ. J., Ex. T.)

The court finds that Defendant Gray reasonably relied on Defendant Tiona's medical judgment. More specifically, Defendant Gray had no authority to schedule Plaintiff for surgery with an outside, non-CDOC medical professional. (Gray Aff. ¶ 2.) Defendant Gray was therefore entitled to reasonably rely on Defendant Tiona's conclusion that the sydesmotic screw did not need to be removed. (*See* Tiona Aff. ¶¶6-7; Mot. Summ. J., Ex. K.) Similarly,

Defendant Gray was entitled to rely on Defendant Tiona's decision to prescribe Plaintiff Ibuprofen, rather than Tylenol or Neurotin, in light of the CDOC regulations restricting the use of Neurontin to circumstances inapplicable to Plaintiff and the fact that there was no indication that prescribing Ibuprofen would have any adverse effect. Finally, as noted above, there is nothing in the record suggesting that Plaintiff needed to use a wheelchair for his injury. (Mot. Summ. J., Ex. G; Phillips Dep. 17:16–18:1.) Thus, there was no reason for Defendant Gray to believe that Plaintiff was receiving inadequate or inappropriate care. *Bond*, 228 F. Supp. 2d at 920.

Plaintiff also maintains that Defendant Gray was deliberately indifferent because she "failed to provide adequate medical care, by failing to retrieve 'all' of Plaintiff's medical records, in which is mostly to blame for inadequate medical care." (Am. Compl. at 16.) The court first notes that Plaintiff has not set forth any evidence suggesting that all of Plaintiff's medical record were not received by KCCC. (Gray Aff. ¶ 7.) In any event, while a failure to procure medical records may constitute deliberate indifference to an inmate's medical needs where the inmate's medical records would have put prison officials on notice of a serious medical condition, *see, e.g., Popoalii v. Corr. Med. Servs.,* 512 F.3d 488, 500 (8th Cir. 2008), this is not such a case. Rather, because the court has already concluded that Defendants Gray and Tiona's actions did not amount to deliberate indifference *even in light* of Plaintiff's proffered medical records and prior course of treatment, Defendant Gray's alleged failure to procure Plaintiff's medical records does not independently establish that Defendant Gray was deliberately indifferent to Plaintiff's serious medical needs.

26

Altogether, the court finds that Plaintiff has not established any genuine issue of material fact as to whether Defendant Gray fulfilled her gatekeeping function, or as to whether Defendant Gray was otherwise deliberately indifferent to Plaintiff's serious medical needs.  Accordingly, the court finds that summary judgment is properly entered as to Plaintiff's Eighth Amendment claim against Defendant Gray.

WHEREFORE, for the foregoing reasons, I respectfully

RECOMMEND that Plaintiff's "Motion to Strike Defendants [sic] Exhibit A" (Doc. No. 290) be DENIED, that Defendant's Motion for Summary Judgment (Doc. No. 255) be GRANTED, and that judgment be entered in favor of defendants on all remaining claims in this action.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's

27

proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 10th day of November, 2011.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge

28